AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No. 2:22-mj-03980-DUTY |
| PARHAM BAGHERABADI, | |
| Defendant. | |

LODGED
CLERK, U.S. DISTRICT COURT
10/12/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: VAV  DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
10/12/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of April 5, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Dealing in Firearms without a License |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Special Agent Jannah R. Holden
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: October 12, 2022

*(signature)* Alicia G. Rosenberg
*Judge's signature*

City and state: Los Angeles, California

Hon. Alicia G. Rosenberg, U.S. Magistrate Judge
*Printed name and title*

AUSA: Morgan J. Cohen (x2848)

**AFFIDAVIT**

I, Jannah R. Holden, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Parham Bagherabadi ("BAGHERABADI") for a violation of 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms without a License).

2. This affidavit is also made in support of an application for a warrant to search 8525 Brown Creek Lane, Canoga Park, California 91304 (the "SUBJECT PREMISES"), as described more fully in Attachment A-1, and the person of BAGHERABADI, as described more fully in Attachment A-2, for evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 922(a)(1)(A) (Manufacturing and/or Dealing in Firearms without a License), 922(o) (Possessing or Transferring a Machinegun), and 26 U.S.C. § 5861(d) (Possession of an Unregistered Firearm). Attachments A-1, A-2, and B are incorporated herein by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.  I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since September 2020. Prior to becoming a Special Agent with ATF, I served as a Special Agent with the Naval Criminal Investigative Service for approximately three years. I am currently assigned to the ATF Los Angeles Division, Glendale V Field Office, in Glendale, California.

5.  I received a Bachelor of Science degree in Criminal Justice from Old Dominion University in Norfolk, Virginia and a Master of Science Degree in Criminology from Boston University in Boston, Massachusetts. I served in the United States Navy and honorably separated in 2004 at the rank of Petty Officer Second Class. I thereafter worked for seven years with the Federal Bureau of Investigations in Norfolk, Virginia and Los Angeles, California. I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy's Special Agent Basic Training course.

6.  As a Special Agent, I have received training in federal firearms laws, confidential source handling, drug identification, federal drug laws, and various surveillance and investigative techniques. I regularly refer to these laws and regulations during the course of my duties and have written and participated in the execution of several federal search and arrest warrants in violation of these laws. I have participated

in surveillance of individuals committing crimes of violence, narcotics trafficking, as well as prohibited persons in possession of firearms.

7. During my tenure as a Special Agent, I consult regularly with experienced investigators concerning the methods and practices of firearms and narcotics traffickers. Through my experience and training, I have become familiar with the illicit manner in which firearms are acquired and controlled substances are imported, manufactured, distributed, and sold. I have also become familiar with the efforts of individuals engaged in the importation, smuggling, manufacturing, distribution, and sale of firearms and controlled substances to avoid detection and apprehension by law enforcement officers.

### III. SUMMARY OF PROBABLE CAUSE

8. Between April 2022 and September 2022, BAGHERABADI sold the following items to two individuals he believed to be customers, but who were in fact an undercover ATF Special Agent (the "UC") and ATF Confidential Informant[1] (the "CI"): one unserialized pistol, commonly known as a "ghost gun"; and 11 drop-in auto sears. A drop-in auto sear is a device used to convert a semi-automatic, AR-15-type rifle into a fully

---

[1] The CI has worked with law enforcement since April 2019 in exchange for monetary compensation. In 2022, the CI has been paid approximately $24,200. Throughout his/her tenure as a CI, the CI has provided information that has been corroborated and proved to be accurate. The CI has a prior felony conviction for driving under the influence, as well as several prior misdemeanor convictions, including for disorderly conduct, driving under the influence, driving without a license, driving on a suspended license, and manufacture/ possession of a dangerous weapon.

3

automatic rifle and meets the definition of a "machinegun" under 26 U.S.C. § 5845(b) and a "firearm" under 26 U.S.C. § 5845(a). In text messages with the CI, and in covertly recorded audio and video conversations with the UC and CI, BAGHERABADI indicated that he uses 3D printers to manufacture the drop-in auto sears he sells. BAGHERABADI resides at the SUBJECT PREMISES.

## IV. STATEMENT OF PROBABLE CAUSE

9. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A. ATF Identifies BAGHERABDI as a Potential Manufacturer of Drop-In Auto-Sears

10. Based on conversations with other ATF Special Agents, I know that the CI contacted ATF in March 2022 and advised that an individual known as "Parham," later identified as BAGHERABADI, had told him/her that he manufactures drop-in auto sears and sells them, as well as handguns, to buyers in the Los Angeles area. The CI also advised that BAGHERABADI was associated with the phone number 818-808-9200 (the "9200 number"). Using law enforcement databases, ATF Special Agents confirmed that the 9200 number was associated with BAGHERABADI.

11. On April 1, 2022, at the direction of the ATF, the CI exchanged text messages with BAGHERABADI at the 9200 number in which the CI stated that he/she wanted to purchase drop-in auto sears and any available handguns from BAGHERABADI.

4

**B.   April 5, 2022: BAGHERABDI Sold an Unserialized Firearm and Three Drop-In Auto Sears to an ATF Undercover Agent**

12.   Based on my review of text messages between the CI and BAGHERABADI at the 9200 number, I know that between March 23, 2022, and April 5, 2022, BAGHERABADI and the CI arranged an in-person meeting at which BAGHERABADI would sell drop-in auto sears to the CI for $100 apiece. Specifically, BAGHERABADI agreed to meet the CI during the evening on April 5, 2022, at Oh Grady's Lounge, located at 17633 Chatsworth Street, Granada Hills, California 91344 ("Oh Grady's Lounge"), in order to complete the sale.

13.   On April 5, 2022, BAGHERABADI met with the CI and UC at Oh Grady's Lounge. The UC wore a covert audio and video recorder. Based on my conversations with the UC and my review of the UC's audio-video recording of the meeting, I know the following:

   a.   At approximately 7:53 p.m., the CI and UC entered Oh Grady's Lounge and waited for BAGHERABADI to arrive.

   b.   At approximately 8:08 p.m., BAGHERABADI arrived and made contact with the CI and UC. Among other things, BAGHERABADI told the CI and UC that he uses a 3D printer to manufacture the drop-in auto sears. BAGHERABADI also stated that he uses a nylon and fiberglass blend to manufacture the drop-in auto sears, which he stated made them durable.

   c.   At approximately 8:34 p.m., BAGHERABADI, the CI, and the UC walked out the front door of Oh Grady's Lounge towards BAGHERABADI's dark colored pickup truck, which was

5

parked nearby. BAGHERABADI opened the front passenger door of the pickup truck and retrieved a small green bag, which he then opened. Inside the bag there was a pistol and a plastic baggie that contained several drop-in auto sears. The pistol was later determined to be a Polymer 80 privately made handgun, commonly known as a "ghost gun," which BAGHERABADI offered to sell for $1,000. The UC paid BAGHERABDI $1,300, for the ghost gun and three drop-in auto sears.

      **C.**    **April 21, 2022: BAGHERABADI Sold Four Drop-In Auto Sears to the UC**

14. Based on my review of text messages between the CI and BAGHERABADI at the 9200 number, I know that between April 7, 2022, and April 21, 2022, BAGHERABADI and the CI arranged an in-person meeting at Oh Grady's Lounge on the evening of April 21, 2022, at which BAGHERABADI would sell drop-in auto sears for $100 apiece.

15. On April 21, 2022, BAGHERABADI met with the CI and UC at Oh Grady's Lounge. Based on my conversations with the UC and my review of the UC's audio-video recording of the meeting, I know the following:

    a. At approximately 7:03 p.m., the CI and UC entered Oh Grady's Lounge and met with BAGHERABADI, who was seated at the bar. Among other things, BAGHERABADI discussed with the CI and UC how many rounds could be shot using the drop-in auto sear, manufacturing firearms, including via 3D printers, and different types of 3D printers.

      b.    At approximately 7:28 p.m., while inside Oh Grady's Lounge, BAGHERABADI handed the UC a plastic baggie that contained three drop-in auto sears.  BAGHERABADI stated that he had to grab a fourth drop-in auto sear out of his truck, and then left the bar.  Shortly thereafter, BAGHERABADI returned and handed the fourth drop-in auto sear to the UC.

      c.    The UC paid BAGHERABADI $400 for the four drop-in auto sears.

      **D.**    **September 21, 2022: BAGHERABADI Sold Four Drop-in Auto Sears to the UC**

    16.    Based on my review of text messages between the CI and BAGHERABADI at the 9200 number, I know that between May 26, 2022, and September 21, 2022, the CI texted BAGHERABADI about purchasing three more drop-in auto sears.  During these exchanges, BAGHERABADI stated that he "made some new stuff" -- a reference to new drop-in auto sears -- which he stated he stated he would bring.  Ultimately, BAGHERABADI agreed to meet the CI on September 21, 2022, at Oh Grady's Lounge to complete the sale.

    17.    On September 21, 2022, BAGHERABADI met with the CI and UC at Oh Grady's Lounge.  Based on my conversations with the UC and my review of the UC's audio-video recording of the meeting, I know the following:

      a.    At approximately 7:54 p.m., the CI and UC entered Oh Grady's Lounge and met with BAGHERABADI, who was seated at the bar.  The CI asked BAGHERABADI about the new drop-in auto sears to which he had referred.  BAGHERABADI replied

that he had made new drop-in auto sears which could be installed in a wide variety of guns.

      b.    At approximately 8:00 p.m., the UC told BAGHERABADI that he/she sold drop-in auto sears primarily to gun enthusiasts. BAGHERABADI asked if the UC's customers were "bad people," and the UC reiterated that they were gun enthusiasts. BAGHERABADI went on to discuss the National Firearms Act, and stated that even if one wanted to legally possess a drop-in auto sear in California, it was not possible to obtain a license to do so. The UC then asked BAGHERABADI about the process of manufacturing the drop-in auto sears, and BAGHERABADI stated that the process was not costly and that all he had to do was use one of his 3D printers, which were capable of making one device at a time.

18.    At approximately 8:05 p.m., BAGHERABADI pulled out a small plastic baggie that contained four drop-in auto sears. BAGHERABADI explained that two were the new version of drop-in auto sear, and two were the previous version of drop-in auto sear. BAGHERBADI confirmed the price was $100 apiece. The UC examined the devices and then paid BAGHERABDI $400.

    **E.**    **ATF Firearms Experts Concluded that the Drop-In Auto Sears Sold By BAGHERABADI Were Solely and Exclusively For Converting a Firearm Into a Machinegun**

19.    On April 13, 2022, ATF Firearms Enforcement Officer ("FEO") Ronald Davis examined the three drop-in auto sears sold by BAGHERABADI on April 5, 2022, and concluded that each was (1) designed and intended solely and exclusively to convert a

8

firearm into a machinegun, and (2) a "machinegun," as defined in 26 U.S.C. § 5845(b).[2]

20. On May 3, 2022, ATF FEO Ronald Davis examined the four drop-in auto sears sold by BAGHERABADI on April 21, 2022, and concluded that each was (1) designed and intended solely and exclusively to convert a firearm into a machinegun, and (2) a "machinegun," as defined in 26 U.S.C. § 5845(b).

21. On September 29, 2022, ATF FEO Wayne Moser examined the four drop-in auto sears sold by BAGHERABADI on September 21, 2022, and concluded that each was (1) designed and intended solely and exclusively to convert a firearm into a machinegun, and (2) a "machinegun," as defined in 26 U.S.C. § 5845(b).

22. Based on my training and experience, I know that the term "firearm" used in 18 U.S.C. § 922 is defined in 26 U.S.C. § 5845(a) to include, among other things, a machinegun. Accordingly, because the drop-in auto sears are machineguns, they also qualify as firearms under 18 U.S.C. § 922 and 26 U.S.C. 5861.

F. **Investigation of the SUBJECT PREMISES**

23. On October 12, 2022, I searched California Department of Motor Vehicles records and saw that the SUBJECT PREMISES is

---

[2] 26 U.S.C. § 5845(b) states: "The term 'machinegun' means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, **any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun**, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person." (Emphasis added).

9

listed as BAGHERBADI's residence.  I also learned that a Ford pickup truck -- which I believe is the same pickup truck from which BAGHERABADI retrieved the bag containing the ghost gun and drop-in auto sears during the April 5, 2022, sale -- is registered to the SUBJECT PREMISES.

24. Based on my conversations with other law enforcement agents, I know that on October 7, 2022, Los Angeles Police Department officers spoke with a woman who identified herself as BAGHERABADI's mother at the SUBJECT PREMISES, who confirmed that BAGHERABADI resides at the SUBJECT PREMISES.

### V. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

25. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

   a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.  Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

26. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such file's months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    27.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

28. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a

14

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    29.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BAGHERABADI's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of BAGHERBADI's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    30.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

\\
\\

15

## VII. CONCLUSION

31. For all of the reasons described above, there is probable cause to believe that BAGHERABADI has committed a violation of 18 U.S.C. § 922(a)(1)(A) (Dealing in Firearms without a License). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the premises described in Attachment A-1 and the person of described in Attachment A-2.

Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this 12th day of October, 2022.

*Alicia G. Rosenberg*
_____
THE HONORABLE ALICIA G. ROSENBERG
UNITED STATES MAGISTRATE JUDGE